Martin Durden was indicted in six counts for violating the Alabama Uniform Controlled Substances Act, § 20-2-70, Code of Alabama 1975 (Acts 1971, No. 1407, p. 2378, § 401[a]). Two of said counts charged Durden with the unlawful sale of cocaine, two counts charged unlawful possession of cocaine, and two charged unlawful possession of marijuana. Durden pleaded "not guilty" *Page 969 
and "not guilty by reason of insanity" to each count, and the counts were consolidated for trial. Durden was found guilty by the jury on all counts. The court sentenced him to serve fifteen years in the penitentiary and pay a five thousand dollar fine on each count of selling cocaine, said prison terms to run consecutively. Additionally, Durden was sentenced to serve five years in the penitentiary for each remaining count, said terms to run concurrently with the two fifteen year terms. Durden's application for new trial raised the issues presented by this appeal and after a hearing the trial court overruled the motion. Durden has been represented at all stages by retained counsel.
On February 28, 1979, officers of the A.B.C. Enforcement Division, Montgomery Police Department, and Montgomery Sheriff's Department seized quantities of cocaine and marijuana from appellant's residence on Pike Road and his place of business, David's Den, both located in Montgomery County, Alabama. The raids were conducted pursuant to two search warrants issued by two District Court judges upon the affidavits and personal examination of one Michael True. The sufficiency of these warrants was challenged by appellant at a pretrial motion to suppress hearing on the ground that the supporting affidavits were faulty. After a hearing, the trial judge overruled the motion.
At trial, the first witness for the State of Alabama was Michael True, who testified that he knew the appellant and had worked for him at various times, both at appellant's farm and at David's Den. True, by his own admission a user and dealer in narcotics, related that he had obtained cocaine from appellant on several occasions and had sold cocaine to one Gater Black, whom he later discovered to be A.B.C. Undercover Agent Larry Payne, on three occasions in early January, 1979. On the third occasion, True stated, he sold the cocaine to Gater Black at a Montgomery apartment complex and subsequently delivered the money he received for the sale to appellant, who was waiting in a nearby parking lot. True testified that he took the money to a bank at appellant's request and changed the larger bills for smaller ones, then returned this money to appellant at David's Den.
The witness testified further that he was arrested in late February, 1979, for selling the cocaine, and conveyed to Montgomery Police Department Headquarters where, in cooperation with A.B.C. Enforcement Agent Don Williams, he placed a telephone call to appellant to arrange another cocaine buy. After talking with appellant, True related he was wired with a transmitter and accompanied Agent Williams, A.B.C. Agent Jack Bell, and several others to appellant's mobile home. At the mobile home, True purchased some cocaine from appellant, which cocaine was turned over to the officers later that night. True stated that the next day he once again arranged to purchase some cocaine from appellant, this time at David's Den. This transaction was also completed after initial misgivings by appellant that he was being "set up." True further testified that he told the officers where appellant kept his marijuana at his residence, and that appellant had secreted some cocaine in an address book at his David's Den office. True admitted to being involved in the sale of drugs and cooperating with the authorities because of his own arrest on the charges of selling cocaine.
Allen Adair, a criminalist with the State Department of Forensic Sciences, testified that he had received three items of evidence, one directly from A.B.C. Agent Larry Williams, and the other two from Lonnie Harden, another employee of the same department, who had in turn received them from Williams. Adair stated that he analyzed the items and found them to contain 3.6 grams, 1.2 grams, and 16 grams, respectively, of cocaine. Adair identified a fourth exhibit as one which had been submitted by A.B.C. Agent Charles West, and which contained .9 of a gram of cocaine. Likewise, the witness identified a fifth exhibit as one which he had received from Criminalist Thomas Hopen, who had in turn received it from A.B.C. Agent David Duke, and stated that it contained a quantity of cocaine, weighed by Mr. Hopen to be 1.96 grams. A *Page 970 
sixth exhibit was identified by the witness to contain 9.4 grams of marijuana, 29 milligrams of cocaine, and one tablet of diazepam (valium). A seventh exhibit was identified as containing 1.6 grams of cocaine and 33 grams of marijuana.
Larry Payne testified that he had been an undercover narcotics agent with the A.B.C. Enforcement Division during early 1979, and had been using the alias "Gater Black" at that time. Payne stated that he had purchased cocaine from Mike True on three separate occasions in early January, 1979, and identified the three exhibits first identified by Mr. Adair as the cocaine which he had received and subsequently turned over to Agent Williams.
Thomas Hopen, a criminalist with the Department of Forensic Sciences, testified to having received and weighed an item from Agent David Duke, subsequently turning it over to Allen Adair.
Lonnie Harden, a firearms and toolmark examiner for the same department, testified to receiving two envelopes from Larry Williams, but could not positively identify them in court.
Don A. Williams, a narcotic investigator with the A.B.C. Enforcement Division, testified that he had arrested Mike True on February 27, 1979, and had taken him to the Montgomery Police Department Headquarters. The witness related that he had asked True to help him apprehend True's supplier. Williams stated that True gave him a phone number, which Williams dialed, and that True had a subsequent conversation, which Williams recorded. Williams testified that he verified the phone number as that of Martin Durden through the Montgomery telephone directory. The tape recording was admitted into evidence and played for the jury. Subsequently, the witness stated, he accompanied True to appellant's trailer and monitored the conversation between True and appellant from a parked car some distance away by means of the hidden transmitter on True's person. Williams stated that True had been supplied with marked money with which to make the purchase. After the meeting, the witness and True returned to the police station where True completed an affidavit, which True later signed in the presence of a district judge.
Williams further testified that he directed True to again contact appellant about purchasing cocaine, that True was supplied with marked money, and that True then went to David's Den. Upon True's return, he was searched and two packages of cocaine removed. The witness initialed the packages and gave them to Agent Duke, and subsequently was able to identify them from the witness stand. Williams stated that he accompanied True before the district judges and witnessed True sign the affidavits in the judges' presence. He further testified that he accompanied those officers conducting the subsequent searches of appellant's business and home, but was unable to locate any of the marked money.
A.B.C. Agent David Duke stated that he had received one exhibit from Agent Williams and had transferred it to Mr. Hopen. After his identification, the evidence was admitted over appellant's objection. A.B.C. Agent Jack Bell testified that he had followed True to appellant's home on the night of February 27, 1979, and had tape recorded True's conversation with appellant through the use of the hidden transmitter and a walkie-talkie, with the aid of Agent Charles West. The witness identified the tape, but appellant's objection to its admissibility was sustained. The witness further stated that he flew a helicopter, keeping appellant under surveillance the next day. A.B.C. Agent Charles West stated that he recorded the serial numbers of the money given to Mike True for the purchase of cocaine, but had been unable to later locate the money during the search at David's Den. The agent identified an exhibit as the cocaine which True had brought back from his visit to appellant's mobile home, which exhibit West transferred to Allen Adair.
A.B.C. Agent Van Kominisky testified to participating in the search of appellant's trailer and finding a fruit cake can containing marijuana and cocaine on the refrigerator in the trailer. This evidence was admitted *Page 971 
over appellant's objection. Montgomery Police Officer Joe Kyser testified that he was present at David's Den when Agent Larry Williams discovered a quantity of marijuana. The witness stated that he assumed possession of the marijuana and subsequently transferred it to Mr. Adair.
The final State's witness was A.B.C. Agent Larry Williams, who related that he had participated in the search of David's Den, and had discovered cocaine secreted in a desk book, and marijuana in a box in an adjoining storage room. He further stated that he had received several packages of cocaine from Larry Payne and had conveyed them to the toxicology laboratory. Finally, he testified that Mike True had told him exactly where the cocaine would be at David's Den.
The State rested, and appellant's motion to exclude for insufficient corroboration, insufficient evidence to establish possession, and the failure of the State to show a prima facie case, was overruled on all counts.
The only defense witness was Vicki Spears, who testified that she worked at David's Den and dated appellant off and on. She testified that she knew Mike True and had heard him speak of using and selling drugs on several occasions. She further related that, on January 4, 1979, she had conveyed appellant to the hospital because of his illness and that she had remained with appellant during the day and night. She stated that appellant had not left David's Den that day, and that True had not come there that day, but had called several days before appellant was arrested about selling appellant some cocaine. She further testified that she had never heard that appellant either used or sold drugs.
 I
Appellant initially contends that certain questions and remarks made by the prosecutor during the course of the trial were so prejudicial and improper as to deny appellant the benefit of a fair trial. The first specific instance of such conduct complained of by appellant concerns a question asked of State's Witness Larry Payne during redirect examination by the prosecutor (R. 121):
 "Q. He [meaning Mike True] was selling to others for Martin Durden?
"MR. BAXLEY: We move for a mistrial.
"MR GILLIS: Defense counsel is asking for. . . .
"MR. BAXLEY: No, sir. We haven't. . . .
 "THE COURT: We will have a legal conference at this time.
 "(At this time, an at-bar discussion out of the hearing of the Jury and the court reporter. Subsequent thereto, the following was had and done of Record.)
"THE COURT: Anything else?
 "MR. GILLIS: I have nothing further to ask of this witness."
Neither motion to strike nor curative instructions were requested or given, and the Court's precise ruling on appellant's motion for mistrial does not appear in the record. It is appellant's contention that the prosecutor's question is to be analogized to the situation where a prosecutor attempts to inject irrelevant or illegal evidence for the purpose of prejudicing the defendant. While such practices have been roundly condemned by this Court as unprofessional, e.g.,Bezotte v. State, Ala.Cr.App., 358 So.2d 521 (1978), close scrutiny of the instant situation does not disclose the presence of those factors so evident in the cases cited by appellant, i.e., the fact that an "attempt upon the solicitor's part to inject into this trial this patently illegal, irrelevant, immaterial, and incompetent evidence was repeated several times," Whitfield v. State, 21 Ala. App. 490, 491,109 So. 524 (1926), or that the questions "implied the existence of factual predicates which the examiner knew he could not support by evidence," Young v. State, Ala.Cr.App., 363 So.2d 1007
(1978); Bezotte, supra.
We should not be understood as approving of this question as asked, for it was certainly objectionable in this situation and indeed the subject of timely objection. But the witness did not interject an answer *Page 972 
to the question, and no ruling adverse to appellant from the trial court appears from the face of the record. "This court may only review rulings of the trial court which are adverse to the appellant . . . [L]ikewise, it is a well-settled rule that improper questions which are not answered are harmless."Kennedy v. State, Ala.Cr.App., 373 So.2d 1274 (1979); Rupert v.State, Ala.Cr.App., 374 So.2d 451 (1979); Jones v. State, Ala.Cr.App., 356 So.2d 728, cert. denied, Ala., 356 So.2d 735
(1978). It is, of course, axiomatic that the grant or denial of a motion for mistrial is a matter within the sound discretion of the trial court which will only be disturbed upon a showing of manifest abuse; no such abuse is evident here. Shadle v.State, 280 Ala. 379, 194 So.2d 538 (1967); Kennedy v. State, supra; § 12-16-233, Code of Alabama 1975.
The second instance of allegedly prejudicial conduct occurred during the State's cross-examination of the lone defense witness, Vicki Spears (R. 253):
"Q. Now, does he own any race horses?
"A. He does race horses.
 "Q. Well, I understand he raises them, how many race horses does he. . . .
 "MR. BAXLEY: I don't know what the purpose of this is, but I think it may be an attempt to prejudice the Jury.
"THE COURT: Are you objecting, sir?
"MR. BAXLEY: Yes, sir.
"THE COURT: On what ground?
"MR. BAXLEY: On the ground of relevance.
"THE COURT: What is the relevancy?
 "MR. GILLIS: Your Honor, I would like to show that he is a supplier of drugs, a dealer of drugs. And you have heard testimony from Mike True. . . .
"MR. BAXLEY: We object to him testifying."
Appellant failed to make either a motion to strike or a motion for mistrial, and now seeks to argue that the prosecutor's statement concerning appellant as a supplier or dealer of drugs was so prejudicial as to deny appellant a fair trial. This contention is without merit in that it was a fact obvious to the jury already that appellant was on trial for selling drugs and that the State would be attempting to show this. Additionally, the prosecutor appears to have only made an attempt to answer the trial judge's query as to the relevancy of the line of inquiry. Finally, the only objection made by counsel for appellant related to the prosecutor "testifying." It is well settled in our law that an accused objecting at trial is bound on appeal by those grounds stated during trial.Williams v. State, Ala.Cr.App., 377 So.2d 634 (1979); Sprinklev. State, Ala.Cr.App., 368 So.2d 554, writ quashed, Ala.,368 So.2d 565 (1978). No reversible error appears in this instance.
 II
Appellant next argues that the two search warrants employed by the officers in searching appellant's home and David's Den were invalid because the supporting affidavits were fatally defective. It appears that the gist of appellant's argument is that it did not appear from the affidavits that the informant had a past history of reliability, despite the fact that the informant's name was known and he appeared before the issuing judges for examination concerning the affidavits. These contentions were advanced to the trial court at the pretrial motion to suppress hearing, and the court subsequently overruled the motion. An examination of the trial record, however, reveals that the search warrants and underlying affidavits are not contained therein, though apparently considered during the motion hearing and quoted to some degree in appellant's brief. Several decisions of this Court have confirmed the rule that "an affidavit and search warrant not contained in the record on appeal cannot be considered on review of the trial court's ruling as to its sufficiency or any of the underlying circumstances supporting the warrant." Connerv. State, Ala.Cr.App., 382 So.2d 601, 604 (1979), cert. denied, Ala., 382 So.2d 605 (1980), and the cases therein cited. There is, of course, a duty on appellant of checking the record before submitting it on appeal, it being his burden to file a timely and correct record. Orum v. State, 286 Ala. 679, *Page 973 245 So.2d 831 (1971); Conner, supra; Tyus v. State, Ala.Cr.App., 347 So.2d 1377, cert. denied, Ala., 347 So.2d 1384
(1977). Because of this deficiency in the record, we cannot consider this issue in deciding this appeal.
 III
Appellant's third contention is that the trial court erred in overruling appellant's motion to exclude the State's evidence as to the possession counts at the conclusion of the State's case-in-chief. Specifically, appellant contends that there was insufficient evidence to indicate beyond a reasonable doubt that the appellant had either control over or knowledge of the cocaine and marijuana seized at his home and place of business. This issue was presented in appellant's motion for new trial, which motion was overruled.
 "In a prosecution for unlawful possession of narcotics it is not necessary to prove manucaption but constructive possession may be shown, and where such possession is relied upon the State must also prove beyond a reasonable doubt that the accused knew of the presence of the prohibited substance. Rueffert v. State, 46 Ala. App. 36, 237 So.2d 520; Spruce v. State, 43 Ala. App. 487, 192 So.2d 747. See cases in 16 Alabama Digest, Poisons, Keynote 9.
 "Such guilty knowledge may be established by circumstantial evidence and guilt does not necessarily depend upon ownership. Parks v. State, 46 Ala. App. 722, 248 So.2d 761."
 Daniels v. State, 49 Ala. App. 654, 275 So.2d 169
(1973).
Of course, such knowledge may be shown by circumstantial evidence. McCord v. State, Ala.Cr.App., 373 So.2d 1242 (1979);Blaine v. State, Ala.Cr.App., 366 So.2d 353 (1978).
During searches of appellant's residence and David's Den, cocaine and marijuana were discovered. In both instances, we believe that the evidence adduced was more than sufficient to permit the inference that appellant knew of the presence of these substances:
AT APPELLANT'S RESIDENCE
 (a) The mobile home on Pike Road was appellant's residence, and no one else was shown to have lived there, though there was testimony that appellant kept a key in an external position.
 (b) The State's primary witness, Mike True, testified as to having been to appellant's trailer, to having first used cocaine there at the behest of appellant, and to knowing where appellant secreted marijuana (in the can on the refrigerator). He testified that he told the officers this.
 (c) True called appellant the night he went to the trailer and purchased cocaine and discussed purchasing the cocaine. This conversation was recorded and the tape admitted as evidence. There was testimony that the number dialed was that of appellant.
 (d) True went to appellant's trailer that night and purchased cocaine, according to his testimony. An officer testified that a search of True after this turned up cocaine.
 (e) Pursuant to this information, a search warrant was obtained, the trailer searched the next day, and cocaine and marijuana located in the can on the refrigerator.
AT APPELLANT'S PLACE OF BUSINESS
 (a) Appellant owned David's Den and conducted a distributorship out of an office in the rear of the shop. There was testimony that he spent a great deal of time there tending to business.
 (b) The day after the buy at appellant's trailer, True testified, he went to David's Den to buy cocaine from appellant. Appellant was unsure about selling it, so True left to get some screws in order to fasten a license plate on appellant's car. This latter *Page 974 
incident was corroborated by Vicki Spears. Upon his return, True stated, appellant sold him cocaine and returned a small excess to an address book on his desk. Upon his emergence from David's Den, True gave officers the cocaine he had purchased.
 (c) Pursuant to this information, the officers obtained a warrant, searched the office, and found the cocaine in the address book, and marijuana in an adjoining storage room where products for appellant's distributorship were stored.
This sketch of the evidence adduced at trial certainly supports the inference that appellant knew of the drugs stored in both locations. This evidence thus raised a question of fact for determination by the jury, and, as it supports their determination of guilt, the actions of the trial court, in overruling appellant's motion to exclude and motion for new trial, were not error. Young v. State, 283 Ala. 676,220 So.2d 843 (1969); McHellen v. State, Ala.Cr.App., 351 So.2d 689
(1977).
 IV
Appellant next complains that he was prejudiced before the jury by the introduction of one State exhibit over objection of appellant, which exhibit was, in the words of the officer seizing it:
 ". . . [A] one-half pound fruitcake can. And inside the can was a small vial that contained cocaine. A large baggie contained a small amount of marijuana. One ten milligram valium tablet and numerous articles of paraphernalia."
Appellant objected and moved to exclude the evidence because it contained the valium tablet, and appellant was not being tried for unlawful possession of valium. This motion was overruled, and appellant urges that the presence of the tablet in the exhibit prejudiced him. There is no merit in this argument.
In Morrow v. State, 52 Ala. App. 145, 290 So.2d 209, cert. denied, 292 Ala. 743, 290 So.2d 213 (1974), this Court allowed the State to introduce a bag containing both marijuana and LSD, despite the fact that the appellant there was on trial only for possession of LSD:
 "Even though the Marihuana is evidence of another distinct criminal act, it was admissible as relevant to the crime charged as being part of the same transaction, and therefore part of the res gestae. Lambert v. State, 48 Ala. App. 600, 266 So.2d 812; Mason v. State, 259 Ala. 438, 66 So.2d 557; and Grant v. State, 250 Ala. 164, 33 So.2d 466."
The Morrow decision was cited by our Supreme Court with approval in Brantley v. State, 294 Ala. 344, 317 So.2d 345
(1975), where that Court concluded that evidence of other drugs and paraphernalia was relevant to show the "`complete story'" and reflect upon intent to merely use or sell. Under the facts and rationale of these two decisions, it is evident that the trial court did not commit error in admitting the fruit cake can containing the various drugs. Green v. State, Ala.Cr.App.,384 So.2d 1215 (1980). The decision in DeGruy v. State,56 Ala. App. 521, 323 So.2d 406, cert. denied, 295 Ala. 399,323 So.2d 411 (1975), cited by appellant, is factually inapposite.
 V
Finally, appellant "most earnestly" contends that the court below erred in failing to properly qualify the jury venire, and urges reversible error because appellant was not present when members of the venire were excused. Specifically, appellant argues that the duty judge for the week of his trial did not comply with the demands of § 12-16-6, Code of Alabama 1975, in asking of the entire venire those items contained in §12-16-150, Code of Alabama 1975. In support of this contention, appellant has gone to great lengths to assemble supplemental transcripts and various affidavits to indicate that the jury was not properly qualified.
Section 12-16-6, Code of Alabama 1975, outlines the "duty of court to ascertain qualifications before administering oath to jurors," and states: *Page 975 
 "It is the duty of the court, before administering the oath prescribed by law to any grand, petit or tales jurors, to ascertain that such juror possesses the qualifications required by law, and the duty required of the court by this section shall be considered imperative."
While the terms of this section do, as strenuously argued by appellant, make this qualifying process "imperative," the appellate courts of this state have never held that an objection to a possibly unqualified venire may be raised at any point during or subsequent to the proceedings below. Instead, the prevailing rule, as enunciated by this Court in Andrews v.State, Ala.Cr.App., 359 So.2d 1172 (1978), provides that:
 "If counsel is to question or object to the jury venire, he must do so prior to the impanelling and swearing in of the jury. Failure to make a timely objection waives the right to question the jury's qualifications, and appellant may not complain for the first time on motion for new trial nor on appeal to this court. Douglas v. State, 50 Ala. App. 602, 281 So.2d 652 (1973); Yancey v. State, 56 Ala. App. 577, 324 So.2d 292 (1975); Hurley v. State, Ala.Cr.App., 341 So.2d 494 (1976), cert. denied, Ala., 341 So.2d 497."
Careful scrutiny of the supplemental transcript filed with the record indicates that not only did appellant not make a timely objection, but spurned an offer by the trial judge to recall the venire and satisfy any doubts that appellant had. In order to demonstrate this, we quote at length from the transcript. After the trial court had examined the jurors at length over possible bias, we find the following took place (Supp.Trans., p. 9):
 "THE COURT: Is there anybody on the Jury Venire who is under nineteen years of age or over sixty-five years of age? Anybody under nineteen, first?
"(There being no response, the Court continuing.)
 "All right. Let me get the names of the ones in the other catagory now.
. . . . .
 "THE COURT: Any additional questions from either side?
 "(At this time, an at-bar discussion was had out of the hearing of the Jury Venire.)
 "MR. BAXLEY: We would like to challenge for cause those over sixty-five.
"MR. BELL: And we would object.
 "THE COURT: We will remove those that said they were sixty-five and that includes the one that was sixty-five.
"Anything else?
 "MR. BELL: We would like to state for the Record that we object to the striking off of those jurors that are over sixty-five, and we also object to it on the ground it is unconstitutional.
"THE COURT: Anything further?
 "(There being no further response, the Jury was selected at this time, placed in the Jury Box and administered the Oath of Service by the Clerk. . . .)
. . . . .
 "(At this time, the Jurors were removed from the Courtroom, and the following was had and done of Record.)
 "MR. LOWERY: If the Court please, I have a motion I want to put in the Record, that the Defendant would object to the Jury that is impaneled to try this case on the grounds it was not qualified before according to Title 12, Section 16-6.
"THE COURT: What does that say?
. . . . .
 "THE COURT: Well, they were qualified this morning. Well, let's get this in the Record, because it would not be in this Record.
 "All of the Jurors, including these Twelve and the Panel that we selected these from were all qualified on the general qualification as to the residents of this County, as to everything else that the law states in our Jury Orientation — The way to do this orientation. All Jurors are in one group and then the presiding Judge, in this case, Judge Taylor, asked them all of the questions that the law says we should ask them as far as their qualifications. And if you want this Record to *Page 976 
show it, go get my Jurors Orientation Book, and I will state in the Record exactly what questions were made. We will just make officially and formally — We will make the Record that was kept this morning, if there was one, a part of this Record. And if there was not one, then I will get it and if you file such a motion to have it included, I will have Judge Taylor file exactly what he did ask them and our orientation as well and this Record should affirmatively be and is hereby amended to show that.
 "MR. LOWERY: The Defendant was not present at the time the questions were asked before Sam Taylor.
 "THE COURT: He had an opportunity to be, or his lawyers did.
"MR. LOWERY: We would take issue about that.
 "THE COURT: The Court asked the Jury all of the questions that the Court was called upon to ask them. And I will verify again, if you want me to, that these particular ones possess all of the required qualifications, if you ask me to. "MR. LOWERY: We will file a motion and ask. . . .
 "THE COURT: I am saying as soon as the Jury gets back, I will get just the questions that should be asked to them about the residence and everything else and ask them, if you want me to.
 "MR. BAXLEY: Too late for us now, if they were not okay, so we would not insist. . . .
 "THE COURT: It may or may not be too late. But I will ask them, if you so move.
"MR. LOWERY: We stand on our motion.
 "THE COURT: If there is something in the Record that you want the Court to disclose, that you think you have a Jury that is not qualified, I will help you to find out. And it is not too late to find out.
 "MR. LOWERY: We would like to see the transcript of the proceeding before Judge Taylor whereby the Defendant was not present.
 "THE COURT: I do not know. But I will ask them if they are all residents of the County. And I did ask all of them if anybody was under nineteen and over sixty-five. I will ask them if anybody is afflicted with a permanent disease or weakness which makes them unfit and able to serve on a Jury. I will ask them if they are all able to read and understand English. And I will ask them if any of them have been convicted of an offense involving moral turpitude.
 "MR. LOWERY: We would stand on our objection but would not object to the Court doing it Sua sponte.
 "THE COURT: I am not going to do it Sua sponte, whatever that means. I will do it pursuant to your request.
 "MR. BELL: Are you going to do that as to the ones struck? Of course, the State — It is not the State's objection, but I have a feeling upon appeal, if the case gets that far, the probable argument would be that the folks struck probably should have been asked that, too.
 "THE COURT: Well, I will bring them all back and ask the whole bunch if they want to. They can call down to the Jury Assembly Area and get them all back.
"MR. BAXLEY: Judge, we do not insist on that.
 "MR. LOWERY: Now on our motion to suppress. . . ." [Emphasis supplied.]
It is apparent from this extended exchange that appellant not only made an untimely objection, but proceeded to trial without availing himself of the remedies offered by the trial court. This Court noted in Murrell v. State, Ala.Cr.App.,377 So.2d 1102, cert. denied, Ala., 377 So.2d 1108 (1979):
 "A defendant cannot by his own voluntary conduct invite error and then seek to profit thereby. Boutwell v. State, 279 Ala. 176, 183 So.2d 774
(1966); Aldridge v. State, 278 Ala. 470, 179 So.2d 51
(1965); Buford v. State, 214 Ala. 457, 108 So. 74
(1926); Barber v. State, 151 Ala. 56, 43 So. 808
(1907)." *Page 977 
Appellant has contended that the affidavits and record indicate that the jury judge did not comply with § 12-16-6, Code of Alabama 1975, in the first place. However, from our scrutiny of this matter, it is by no means clear that the duty judge did or did not do his imperative duty (See Volume Two, pp. 406-407).
 "`But very many things occur in the trial of such causes of which no record need be made, and yet they require affirmative action of the court, or of some ministerial officer. Ascertaining the qualifications of jurors is an example of this class of judicial questions. . . . When the record is silent on questions of these classes, this court presumes the trial court and its officers did their duty.'" [Emphasis in original.]
 Winn v. State, 44 Ala. App. 271, 207 So.2d 138 (1968), quoting Washington v. State, 81 Ala. 35, 1 So. 18
(1887).
Appellant's final point in his argument concerns the assertion that he was not present when the duty judge was supposed to have qualified the venire. His presence or lack thereof is immaterial, for the excusal of jurors is not required to be in the presence of accused except in capital cases. Andrews v. State, Ala.Cr.App., 359 So.2d 1172 (1978);Dean v. State, 54 Ala. App. 270, 307 So.2d 77 (1975).
We have carefully examined the record and find same to be free of error. The judgment and sentences set below are therefore
AFFIRMED.
All the Judges concur.